In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2694

AA SALES & ASSOCIATES, INCORPORATED,

*Plaintiff-Appellant,*

*v.*

CONI-SEAL, INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 4636—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED SEPTEMBER 16, 2008—DECIDED DECEMBER 9, 2008

Before CUDAHY, FLAUM and ROVNER, *Circuit Judges.*

CUDAHY, *Circuit Judge.* AA Sales alleges that Coni-Seal breached the parties' contract, as well as the Illinois Sales Representative Act, 802 Ill. Comp. Stat. 120/1, *et seq.*, by failing to pay it the commissions it was due. It alleges that it labored for nearly a decade to convince the retailer AutoZone to do business with Coni-Seal, and that Coni-Seal wrongfully denied it commissions after it finally

started making sales to AutoZone. It also claims that Coni-Seal failed to pay it the post-termination commissions it is due based on Coni-Seal's sales to AA Sales' former accounts.

The district court granted Coni-Seal's motion for summary judgment, finding, *inter alia,* that there was no evidence that AA Sales actually effectuated Coni-Seal's sales to AutoZone. We affirm that portion of the judgment dismissing AA Sales' claim for post-termination commissions based on Coni-Seal's sales to accounts AA Sales gave up in 1995, but reverse the dismissal of AA Sales' claim for commissions based on Coni-Seal's AutoZone sales.

## I.

Coni-Seal is a family-owned automobile parts manufacturer. Originally, it made brake parts. More recently, it expanded its product line to include, among other things, chassis parts—parts related to an automobile's suspension system. AA Sales is a manufacturers' sales representative; Gerald Saltzman is its owner and sole employee. Saltzman began working with Coni-Seal in the 1980's. According to Saltzman, in the early days of the parties' relationship Coni-Seal offered few products and had no large national accounts. Saltzman helped Coni-Seal secure its first large, national clients and Coni-Seal rewarded him by naming him its "special national accounts representative" in 1987.

The parties memorialized their 1987 agreement in a one-page contract that lies at the center of the present dispute.

The 1987 written contract entitled AA Sales to a six percent commission "on all products sold to the approved accounts," and provided for post-termination commission payments "on all accounts that had been previously called on and sold by AA Sales." "Approved accounts," in turn, were defined as accounts that Coni-Seal had given AA Sales written authorization to solicit. The contract did not prohibit oral modifications, and the parties subsequently modified the contract orally in two important respects: first, they began negotiating commissions on an account-by-account basis; and second, they dispensed with the written approval requirement, and Coni-Seal began giving Saltzman oral approval to solicit particular clients.

In 1994, Coni-Seal gave Saltzman oral approval to solicit sales from AutoZone, a large retailer of auto parts and accessories. In exchange, Saltzman was promised a three percent commission on all AutoZone sales. Relying on Coni-Seal's representation that AutoZone was AA Sales' account, Saltzman made approximately fifty sales trips at his own expense to AutoZone's headquarters in Memphis, Tennessee.

In 2001, Coni-Seal announced that it was expanding its product line to include chassis parts. Although the parties disagree about the details of this announcement, Saltzman concedes that he was initially told that Coni-Seal had no inventory or catalogs for its new product line and that Coni-Seal's sales representatives were "advised" not to attempt to sell chassis parts until they were notified that the line was ready. Saltzman further concedes that he was never expressly told products from

the chassis line were available for sale. However, Saltzman claims that he was authorized under the original agreement to sell all of the products contained in Coni-Seal's products catalog and that Coni-Seal later sent him client programs that included products from its chassis line.

Prior to Coni-Seal's announcement of its new chassis line, the parties' relationship had begun to sour. In 1995, Coni-Seal reassigned several accounts to its regional sales staff.[1] In exchange for yielding responsibility for these accounts, Saltzman agreed to accept a two percent "override" commission based on Coni-Seal's Illinois sales, as well as a flat fee of $1,700 per month.

The deterioration of the parties' relationship came to a head in 2003 when Coni-Seal authorized a second sales representative to make sales calls on AutoZone. When Saltzman learned of this, he confronted Coni-Seal's president Frank Pagano. He alleges that Pagano told him that Saltzman would share responsibility for the AutoZone account and assured him that he would still be entitled to the three percent commission he was originally promised. Later in 2003, Saltzman alleges that Coni-Seal asked him to split his AutoZone commissions with its other sales representative and that he refused.

In 2004, Coni-Seal began selling chassis parts to AutoZone, first in Mexico and shortly thereafter in the United States. Saltzman was not personally responsible for bringing about these sales. Around this time, Saltzman

---

[1] Specifically, Coni-Seal reassigned its Illinois regional accounts as well as its Unicor account.

alleges that Pagano asked him to stop making sales calls on AutoZone, but again promised him that he would be paid commissions. Although Coni-Seal has made several million dollars in chassis sales to AutoZone since 2004, it has paid AA Sales no commissions based on these sales. In 2006, Coni-Seal notified Saltzman that it would discontinue the override and fixed income payments that it had been making pursuant to their 1995 "override" agreement. Saltzman commenced this action shortly thereafter.

**II.**

We review *de novo* the district court's decision granting Coni-Seal's motion for summary judgment. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 685 (7th Cir. 2008). Summary judgment is appropriate if a case presents "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A "genuine issue" exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *See Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). The parties agree that Illinois law applies.

Saltzman was not actually responsible for persuading AutoZone to buy chassis parts from Coni-Seal. The issue now is whether under the 1987 written contract and the Illinois Sales Representatives Act ("ISRA") he was entitled to commissions on those sales even though he did

not actually effectuate them. The ISRA creates a cause of action for a principal's failure to pay "commissions due at the time of termination of a contract between a sales representative and principal . . . and commissions that become due after termination." 820 Ill. Comp. Stat. 120/2. Claims under the ISRA, in other words, presuppose the existence of a valid sales representatives' contract. Thus, AA Sales' claim under the ISRA is parasitic on its breach of contract claim: if it is entitled to commissions under the parties' contract, then the dismissal of its ISRA claim was improper; otherwise not.

We begin by considering the language of the parties' contract. *See LaSalle Nat'l Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir. 1987) ("The starting point must be the contract itself. If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over.") (citation omitted). The relevant parts of the parties' contract can be reproduced in their entirety:

> [1] A A Sales & Associates, Inc. will act as the exclusive agent for Coni-Seal on selected accounts.

> [2] All accounts must be approved by Coni-Seal prior to solicitation by A A Sales. A signed approval form will be forwarded back to A A Sales . . . .

> [3] Coni-Seal Inc. agrees to pay A A Sales a Commission of six (6) per cent on all products sold to the approved accounts . . . .

> [4] Either party may terminate this agreement . . . [on] ninety (90) days written notice . . . .

[5] If termination is given by Coni-Seal, they (Coni-Seal) agree to continue to pay A A Sales a six (6) per cent commission on all accounts that had been previously called on and sold by A A Sales. This commission shall continue to be paid to A A Sales for a period of 5 years.

The district court held that the contract requires AA Sales to actually effectuate a sale in order to be entitled to a commission. *See AA Sales & Assoc., Inc. v. Coni-Seal, Inc.*, No. 06-4636, 2007 WL 1834399, at *3 (N.D. Ill. June 26, 2007). We disagree. By its plain terms, the contract requires Coni-Seal to pay AA Sales a commission on all sales to "approved accounts," viz. accounts with respect to which AA Sales has been authorized to act as its exclusive agent. Further, while the second paragraph requires AA Sales to obtain Coni-Seal's written approval prior to soliciting a customer, both parties claim that they orally agreed to eliminate the written approval requirement. Both parties also claim Saltzman was given verbal approval to solicit AutoZone in 1994, and was promised a commission of three percent based on Coni-Seal's sales to AutoZone.

Nor does the contract's fifth paragraph—according to which AA Sales will be entitled to post-termination commissions only for accounts "previously called on and sold"—support the district court's conclusion. The court reasoned that "the fact that the contract distinguishes between the terms 'called on' and 'sold' makes clear that, under the terms of the 1987 contract, AA Sales must actually make sales to customers, rather than

merely making contact with customers." 2007 WL 1834399, at *3. The court was right to observe that the words "called on" and "sold" would be redundant if they were not assigned different meanings. *Id.* However, this does not mean that the word "sold" should be viewed in isolation and assigned the same meaning in paragraphs three and five irrespective of any difference in context. On the contrary, it seems clear that the word "sold" does one kind of work in the phrase "sold to approved accounts," but quite another in the phrase "sold by AA Sales."

It is a fundamental principal both of our canons of interpretation and indeed of philosophy of language that particular bits of contract language must be interpreted in their own context. *Compare Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 316 (2d Cir. 2007) (Katzmann, J., concurring with *en banc* judgment) ("Text without context can lead to confusion and misunderstanding."), *with, e.g.,* LUDWIG WITTGENSTEIN § 3.3 TRACTATUS LOGICO-PHILOSOPHICUS (C.K. Ogden, trans. 1992) ("only in the context of a proposition has a name meaning."). During the life of the contract, AA Sales was entitled to commissions based on "*all products sold to the approved accounts*." (emphasis added). This language does not require AA Sales to prove that it actually effectuated sales in order to be entitled to a commission. On the contrary, we think the contract means what it says: while the contract remains in effect, AA Sales will be entitled to commissions based on all sales to approved accounts; after the contract has been terminated, however, it will be entitled to commissions only when it can show that it actually brought about sales to the relevant account while the contract was still in effect.

For this same reason, we are not persuaded by Coni-Seal's attempt to rely on Illinois's "procuring cause rule" to achieve by operation of law what the district court did by misinterpreting the contract. Under the Illinois procuring cause rule, brokers are not entitled to a commission unless they can show that they actually sold the property in question, were instrumental in bringing about the sale or procured a purchaser who was willing and able to purchase on the stipulated terms. *Lord v. Melton*, 400 N.E.2d 547, 550 (Ill. App. Ct. 3rd Dist. 1980). However, the procuring cause rule is merely a default rule and is inapplicable when a contract specifies other bases of fee recovery. *See Hammel v. Ruby*, 487 N.E.2d 409, 411-12 (Ill. App. Ct. 5th Dist. 1985); *see also Grubb & Ellis Co. v. Bradley Real Estate Trust*, 909 F.2d 1050, 1055 (7th Cir. 1990) ("when an agency agreement expressly provides for the payment of a commission upon sale without regard to the agent's role in the transaction, the agent's failure to procure the sale is irrelevant."). Because the parties' contract does not require AA Sales to show that it was the cause of a sale in order to be entitled to pre-termination commissions, the procuring cause rule does not apply.

Nor, finally, are we persuaded by Coni-Seal's argument that Saltzman is entitled to commissions only for *domestic sales of automotive brake parts* for the ostensible reason that the contract names AA Sales a "*National* Accounts Representative" (emphasis added), and was printed on letterhead bearing Coni-Seal's logo, which at the time read "Coni-Seal Automotive *Brake Parts*" (emphasis added). Coni-Seal's logo no more forms a part of the contract than does its address and telephone number, which are

printed at the bottom of the page. *See Atlantic Mut. Ins. Co. v. Metron Eng'g & Constr. Co.*, 83 F.3d 897, 899 (7th Cir. 1996) ("Under Illinois law introductory language or recitals are not binding obligations."). Further, although the contract names AA Sales a "national accounts representative," there is no indication that the parties intended this title to limit geographically the types of accounts that Coni-Seal could authorize. Indeed, Saltzman gave uncontradicted testimony that he had been assigned international accounts as well as domestic accounts, and that Coni-Seal paid commissions based on its sales to these accounts without objection.

## III.

Because the terms of the parties' contract entitles AA Sales to a commission on all sales to approved accounts, the central issue is whether Coni-Seal's sales to AutoZone constitute *sales to an approved account* within the meaning of the contract. Coni-Seal argues that these were not sales to an approved account because AutoZone bought only *chassis* parts, not brake parts, and because Coni-Seal's first sales were made to AutoZone stores in Mexico. In effect, Coni-Seal claims that AutoZone is not one account but many: AutoZone Mexico is one account, AutoZone U.S. another; AutoZone brake parts is one account, AutoZone chassis parts another.[2] In support of this claim, Coni-Seal

---

[2] Coni-Seal's position is weakened somewhat by its counsel's concession at oral argument that sales of chassis parts and brake

(continued...)

notes that when the parties' contract was executed in 1987, and indeed when Saltzman was first authorized to call on AutoZone in 1994, Coni-Seal had not even developed its line of chassis parts. Further, Coni-Seal alleges that Saltzman was instructed *not* to attempt to sell its chassis products until he was expressly authorized to do so, and that he was never subsequently authorized to begin selling products from the chassis line. Finally, Coni-Seal notes that Saltzman admits that he never even attempted to sell Coni-Seal chassis products.

Saltzman's version of events, not surprisingly, is quite different. Although he admits that he never attempted to sell products from Coni-Seal's chassis line, he denies that he was forbidden from attempting to do so. First, he notes that Coni-Seal expanded its product line significantly over the years, and claims that he was always authorized to sell all of the parts listed in Coni-Seal's products catalog, including products that Coni-Seal began manufacturing well after the parties' contract was first executed. Second, he disputes Coni-Seal's characterization of its instructions to him at the time that the new chassis line was announced. Saltzman denies that he was instructed not to sell Coni-Seal chassis parts. Rather, according to him, all of Coni-Seal's sales representatives were told that inventory and cataloging was not yet available when the new chassis line was announced.

---

[2] (...continued)

parts to a particular customer would be considered sales to a single account for the purposes of bill collection.

However, under Saltzman's version of events, he was later given programs to present to clients which included parts from Coni-Seal's chassis line. Third, and most significantly, Saltzman alleges that Coni-Seal repeatedly promised him that he would be paid commissions on its chassis sales to AutoZone.[3]

We cannot determine as a matter of law whether AA Sales is entitled to commissions based on Coni-Seal's sales to AutoZone. If a jury credits Coni-Seal's factual claims, then it could conclude that Saltzman was explicitly forbidden from soliciting sales from AutoZone Mexico's buyers or its chassis buyers, and therefore, that he is not entitled to commissions based on sales to these "unapproved" accounts. On the other hand, if the jury credits Saltzman's testimony, the jury could find that (1) Saltzman made substantial efforts and incurred significant costs in reliance on Coni-Seal's representation that the AutoZone account was his, (2) Coni-Seal subsequently reassigned the AutoZone account to a different sales representative without formally terminating Saltz-

---

[3] Although we take no position on the truth of either party's allegations, we note that Saltzman's version of events is at least partly corroborated by the record. In 2003, Coni-Seal sent Saltzman a series of e-mails apprising him of what it described as its "highly confidential" plan to sell its chassis line through AutoZone stores in Mexico. If AutoZone Mexico was a separate account that Saltzman was not authorized to solicit, and if Saltzman was never authorized to sell chassis parts to any customer, we cannot explain why Coni-Seal would choose to disclose its sales plans to Saltzman.

man's responsibility for the AutoZone account and (3) Coni-Seal terminated the parties' 1987 written contract only after it had begun making substantial sales to AutoZone. In this case, Coni-Seal's failure to pay AA Sales commissions based on its sales to AutoZone prior to the termination of the 1987 written contract and for five years hence would constitute a breach of the contract as well as the ISRA.

## IV.

The parties' dispute concerning their 1995 oral agreement is subject to a different analysis. In 1995 the parties orally agreed that Saltzman would give up responsibility for certain accounts in exchange for a two percent commission based on Coni-Seal's Illinois sales—including its sales to accounts for which Saltzman had not been responsible—as well as a monthly fixed income. This is a modification of the termination provisions of the 1987 written contract, not a new contract. *See Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 189 (Ill. App. Ct. 1st Dist. 2004) ("A 'modification' of a contract is a change in one or more respects which introduces new elements into the details of the contract, or cancels some of them, but leaves the general purpose and effect undisturbed.").

We agree with the district court's decision to dismiss AA Sales' claim based on Coni-Seal's discontinuation of payments under the 1995 oral agreement. *See Taylor v. Canteen Corp.*, 69 F.3d 773, 784 (7th Cir. 1995) ("we may affirm the judgment of the district court on the basis of any ground supported by the record."). Coni-Seal contin-

ued paying commissions based on its sales to Saltzman's
former accounts from 1995 until 2006. AA Sales points
to no evidence that Coni-Seal agreed to continue post-
termination commissions in perpetuity. Indeed, in
keeping with the informal (some would say "sloppy")
manner in which the parties arranged their affairs, they
seem to have failed to address how long these post-termi-
nation commission payments were to continue. Therefore,
the provision of the 1987 written contract entitling AA
Sales to five years of post-termination commission pay-
ments presumptively remains in effect.

As we have often observed, summary judgment is the
"put up or shut up" moment in the life of a case. *Johnson v.
Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).
In the present case, to survive summary judgment, AA
Sales would have to show through specific evidence that
a triable issue of fact remains as to whether it was
entitled to more than five years of post-termination
commissions. Since there is nothing in the record that
could lead a reasonable jury to conclude that AA Sales
was entitled to more than five years of post-termination
commission payments, summary judgment on this claim
was proper.

## V.

Coni-Seal paid AA Sales for over ten years after Saltzman
agreed to give up responsibility for the Illinois and Unicor
accounts. Under the 1987 written contract, AA Sales is not
entitled to more. Accordingly, we AFFIRM that portion of
the district court's judgment that dismissed AA Sales'

claim for commissions based on Coni-Seal's sales to Unicor and to its Illinois regional accounts. However, if a jury were to credit Saltzman's allegations, then AA Sales would be entitled to commissions based on Coni-Seal's AutoZone sales under the 1987 written contract. Accordingly, we REVERSE the remainder of the district court's judgment and REMAND the case for trial on these issues.