In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2043

CLAUDETTE GOODMAN,

*Plaintiff-Appellant*,

*v.*

NATIONAL SECURITY AGENCY, INC.,
IBRIHIM A. KISWANI and ABDUL S. KISWANI,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 1995—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED SEPTEMBER 17, 2009—DECIDED SEPTEMBER 3, 2010

Before ROVNER, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* National Security Agency, Inc. (a Chicago-based private security company, not the secretive intelligence-gathering arm of the federal government) hired Claudette Goodman at a job fair at the end of August 2004. National was ramping up its operations and needed to staff at least two locations for which it had contracted to provide security. Goodman

was hired at an initial rate of $8.25 per hour and began a shift at a North Town housing complex. The shift at the North Town complex was from 6:00 p.m. to 4:00 a.m.

Because she was caring for a teen-aged child, Goodman sought a more favorable shift and transferred to the National operation at Hilliard Homes. Working at National, according to Goodman, was fraught with difficulties. She sensed that she was being overcharged for her uniform. She was sometimes not paid on time. She was often paid less than she was owed. Her checks from National sometimes bounced. But, early on in her time at National, Goodman was promoted to a supervisor position and got a raise to $8.75 an hour.

Goodman was in regular contact with Ibrihim Kiswani, National's owner-operator, about the problems she faced working at his company. (The other defendant, Abdul, is Ibrihim's brother. For all intents and purposes, he is irrelevant to the case.) In August 2005, Goodman suspected that male employees were being paid more than she was. She confronted Kiswani about the suspected pay disparity. He denied it. In October 2005, she got a job at Titan Security. She quit National and started at Titan the next day for $10 an hour.

We have recounted the facts above as the parties have agreed they happened, with deference to the plaintiff's version of events. At issue in this case is whether Goodman was discriminated against in violation of either the Equal Pay Act, 29 U.S.C. § 206(d), or Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1). The district court found that Goodman had not offered evi-

dence sufficient to defeat National's motion for summary judgment on either claim. Specifically, the district court found that Goodman had offered insufficient evidence to prove that there was a discriminatory deficiency in pay or that she was retaliated against as a result of her pay complaints. Goodman appeals the grant of summary judgment.

The disputed issues in the case surround Goodman's departure from National and the rate at which other National employees were paid. Goodman claims that, because of her complaints, her hours at the Hilliard Homes site were changed and that, ultimately, she was scheduled to be transferred back to the North Town complex (a more dangerous location) for the night shift, which would make it difficult to care for her daughter. This impending transfer, she argues, was sufficient to create the adverse employment action required under the retaliation provisions of both the Equal Pay Act and Title VII. She also claims that she offered sufficient evidence that similarly situated male employees at National were paid more than she was.

We review the summary judgment grant de novo and construe all facts and reasonable inferences in favor of the non-moving party (the plaintiff, in this case). *Poer v. Astrue*, 606 F.3d 433, 438-39 (7th Cir. 2010). Summary judgment is only appropriate if the evidence submitted below reveals no genuine issue as to any material fact and the moving party (the defendant) is entitled to judgment as a matter of law. *Id.* at 439. We often call summary judgment, the "put up or shut up" moment in litigation, *see, e.g.*, *Everroad v. Scott Truck Sys.*,

*Inc.*, 604 F.3d 471, 476 (7th Cir. 2010); *Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009), by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely. *See AA Sales & Assocs., Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 613 (7th Cir. 2008).

Much of the difficulty in resolving this case stems from the state of the evidence. There is little extrinsic evidence supporting Goodman's claims, so Goodman's task was to demonstrate that her testimony and the testimony of a coworker, Michael Moore, was sufficient to create a triable issue of fact. Goodman has pointed to several inconsistencies in this testimony that, she argues, reveal genuine issues of fact that merit consideration by a jury. To survive summary judgment on her retaliation claim, Goodman needed to offer evidence to prove the existence of an adverse employment action after she complained about her pay rate. To survive on the discrimination claim, Goodman needed to offer evidence of a discriminatory pay disparity. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 787 (7th Cir. 2007) ("To survive summary judgment, [the plaintiff] must make a sufficient showing of evidence for each element of her case that she bears the burden of proving at trial.").

## I. Retaliation

Goodman alleges that two acts support her Title VII and Equal Pay Act retaliation claims. Most of the evidence

Goodman offers regarding these alleged adverse employment actions comes from her own testimony. And, reading her deposition, we are convinced that her testimony is insufficient to create a triable issue of fact on the issue. "[E]vidence establishing that an adverse employment action has actually taken place is an essential element of [a retaliation] claim." *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1029 (7th Cir. 2004). This is true for both Title VII and Equal Pay Act retaliation claims. *See Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005).

Her first allegation is that National changed her hours in mid-2005 and demoted her from site to shift supervisor. The plaintiff's own testimony does not support her claim. Goodman testified in her deposition that her hours never changed at Hilliard Homes and that she worked the day shift until she quit. Her lawyers are now relying on Ibrihim Kiswani's deposition testimony that he changed Goodman's hours. Even assuming that we disregard the plaintiff's own testimony on the issue, we would need something more than Kiswani's testimony about a change in hours to make out a materially adverse employment action. Goodman needed to provide evidence of harm. *See Burlington N. & Santa Fey Ry. v. White*, 548 U.S. 53, 67 (2006) ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."). Her lawyers claim that Goodman's childcare situation made the hours unworkable, but there is absolutely no testimony in the record that this alleged shift change affected her childcare arrangements. Furthermore, it appears that if her hours changed, they changed in

July 2005 (as with all the evidence in the case, the evidence of timing is unclear). She did not quit until that October. Considering that Goodman is silent about the change in hours, she certainly has not offered any evidence of harm. Accordingly, the evidence she offers on the hour change fails to establish a genuine issue of material fact.

The same thing goes for the argument that she was demoted from her position as *site* supervisor to *shift* supervisor after her complaint. As plaintiff concedes, however, "reassignment of job duties is not automatically actionable." *Id.* at 71. Here, Goodman's pay and benefits did not change and Goodman does not even allege that the job change affected her responsibilities, or moreover, that it affected her in any way, except for having to report to the new site supervisor, Michael Moore. Goodman makes no allegation that reporting to him was itself an adverse employment action. Accordingly, Goodman has once again failed to show that she was harmed by the change.

Finally, we come to the end of her employment. Goodman says she was reassigned to a shift she could not work, which was in essence a type of constructive discharge because the reassignment forced her to look for a new job. Her chief problem with this claim is factual; she was never reassigned. At her deposition she first testified, under examination from the defendant's lawyer, that she quit her job because National wasn't paying her as much as the other supervisors and that a paycheck had bounced. When pressed as to whether she

had listed all the reasons for leaving National, Goodman offered more: "not getting paid on time; waiting two weeks for a check . . .; getting cheated out of overtime; paying for unnecessary uniforms;" and being treated poorly by management when she complained that she hadn't been paid. All of these are great reasons to quit a job, but notably Goodman omitted the impending shift change that she now alleges was retaliatory.

So Goodman's counsel later in the deposition asked her whether the North Town work site was "sometimes used as punishment" by National. She testified that it was "[b]ecause I do recall when I had questioned Abraham [Ibrihim, her boss,] regarding my pay, he had mentioned that he was going to send me back to North Town. And he knew I couldn't work those hours." Her lawyers point to this statement as establishing an adverse employment action. And to make it more clear, plaintiff's counsel reminded her of when defendant's counsel asked her to list "all the reasons" why she left National and whether the shift change to North Town was one of the reasons. "Yes it was," she says, "but there's so many reasons why I left. Like I told him, I could go on and on all day. The thing is I was treated unfairly. That's the bottom line."

Back under examination by defendant's counsel, Goodman was asked whether she was ever actually transferred to North Town, and she testified, "[T]hat was just a threat that he was—that he gave me, that he was going [to] transfer me." Well, did she remember the conversation? "I honestly don't remember the conversa-

tion, but little pieces that I do remember that he said that he was going to send me over to North Town, and we argued about it. I don't remember exactly what was said, but I told him that I wasn't going over there and he knew I couldn't work those houses." She clarified: "I never did make it over there. [*National*] *never changed the schedule.* I heard stories that they were—from other people that they were going to put me over there, but I had started looking for a job. Like I said, the first day I looked I got hired." (The emphasis is ours.)

Because of the inconsistencies in the plaintiff's testimony, we can't say that we have a clear picture of what went on here. Her testimony fails to establish that there was ever a change in her employment (and in fact, her direct testimony is that no change occurred). At best, she testified that she was worried that a shift change may be coming. "[I]t is well established that unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII." *Hottenroth,* 388 F.3d at 1030. Goodman does not allege that the uncertainty over the shift change led her to seek another job; instead, it's quite clear from her own testimony that general dissatisfaction with the amount and manner in which she was being paid led to the job change. This does not constitute a retaliation claim.

## II. Discrimination

The pay issue forms the basis of both her Title VII and Equal Pay Act claims. As a threshold issue, we note

that Goodman argues that the district court did not properly consider her Title VII claim based on pay discrepancy, and instead only considered the retaliation issue. But because we examine the case de novo, we may affirm a grant of summary judgment on any ground in the record, even one the district court did not rely on. *Simmons v. Pryor*, 26 F.3d 650, 653 (7th Cir. 1993). Furthermore, the district court considered her pay claims in the context of her Equal Pay Act argument. The same deficiency that defeats her Equal Pay Act argument also defeats her Title VII claim—she has offered insufficient evidence of a discriminatory pay differential.

Title VII prohibits workplace discrimination with respect to compensation, and terms, conditions, or privileges of employment because of an employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Equal Pay Act similarly prohibits employees from paying employees different wages based on gender. 29 U.S.C. § 206(d). Under either statute, the plaintiff bears the burden of proving her claim. For a Title VII claim, she must allege that her lower pay was a result of discrimination. *See Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 704 (7th Cir. 2003). For an equal pay claim, she must show that "higher wages were paid to a male employee" for "equal work requiring substantially similar skill, effort and responsibilities" that was "performed under similar working conditions." *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998).

Her evidence of a discriminatory pay differential is her own testimony and the testimony of Michael Moore, the

other supervisor at Hilliard Homes. She testified that she heard from Moore that he was being paid more than her, but he admitted later that he just told her that to "get her stirred up." So, the real evidence of Moore's pay is contained in his testimony and the payroll records submitted into evidence. In an affidavit submitted to the district court, Moore testified that he received $9.00 per hour (25 cents more than Goodman) by January 2006 and that he received a pay increase to $9.50 in 2007 after he got his firearm license. In a later deposition, he testified that he had received two raises— one to $8.50 per hour (25 cents less than Goodman) about 90 days after he started and another raise to $9.00 in late 2005 or early 2006. He also confirmed that he was given a raise to $9.50 after Goodman left.

The parties do a lot of fighting over whether the affidavit is sufficient to establish the pay disparity and whether the raise came about because Moore was asked to carry a gun at work, but they seem to forget which dates matter. (In fact, both parties seem to skip a year in their narration of events; both of their statements of facts seem to assume Goodman left work in 2006. The charge Goodman filed with the Illinois Department of Labor and the date of this lawsuit indicate that she ceased her employ with National in October 2005 and sued National in April 2006. Goodman assumed supervisory responsibilities in January 2005, and Moore was transferred back to Hilliard Homes that July. The parties' total failure in figuring out during just what years the events in question took place increased the difficulty of sorting through the record in order to decide this appeal.)

In his affidavit, and also his deposition, Moore pegs his raise to $9.00 to around January 2006. This was three months after Goodman left the company. For all we know, he got a raise to help train her replacement. The plaintiff blithely asserts that Moore's raise was tied to his assumption of supervisory duties at Hilliard Homes in January 2005, but all the evidence shows that he started at the $8.50 rate (or $8.65 according to the payroll records) that January. Moore did offer conflicting reasons for the raise and conflicting accounts of whether he was paid more than Goodman, but both his affidavit and deposition testimony are clear that the raise to $9.00 came around January 2006.

Moore's testimony is partly confirmed by the company's payroll records, which show that he was hired at the same rate as Goodman, but received only a 40-cent bump when she received a 50-cent bump to $8.75. (In his testimony, Moore testifies that this intermediate pay rate was $8.50. In either case, it was below Goodman's). The bump occurred around February 13, 2005, nearly a year before the raise that Moore discusses in his affidavit and deposition. So, the evidence corroborates the defendant's claim that Moore and Goodman received similar raises when they received similar promotions. In addition to the payroll records, all the testimony in the case shows that Moore was a supervisor for almost a full year before he received his second raise. Therefore, the established date of Moore's raise undercuts plaintiff's claim entirely. In fact, all the reliable evidence, even Goodman's, tends to show that Moore was paid less than Goodman during her entire tenure at National.

Goodman makes one last stab at an equal pay claim by attempting to compare herself to other employees who received a higher starting wage than she did. She based this claim below on the existence of mysterious employees 507 and 508, whom she argued were hired the same day she was and were paid more. We are hard-pressed to glean any information from the employment history of these two mysterious employees as it appears in the record. But we know for sure that the plaintiff has failed to show who these employees were, what their duties were, when they started work, where they worked, and what their backgrounds were. She argues that the district court did not address these employees, but her showing on the starting pay issue was so woefully inadequate that the issue did not merit the court's time.

## III. Conclusion

Because the plaintiff has offered insufficient evidence to establish the key elements of her retaliation and discrimination claims, the district court's grant of summary judgment to the defendants was proper. It almost goes without saying that the district court likewise did not abuse its discretion in denying her Rule 59(e) motion to alter or amend the judgment.

AFFIRMED.