2023 IL App (1st) 230894-U

No. 1-23-0894

Order filed December 22, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| DYNAMIC METAL INDUSTRIES, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 20 CH 7040 |
| | ) | |
| LARSEN MANUFACTURING, LLC, | ) | Honorable |
| | ) | Alison C. Conlon, |
| Defendant-Appellee. | ) | Judge presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Justices Mikva and Lyle concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm the circuit court's grant of summary judgment to Larsen Manufacturing, LLC, on claims against it for breach of contract and a violation of the Illinois Sales Representative Act (820 ILCS 120/0.01 *et seq.* (West 2020)).

¶ 2     Pursuant to a contract, Dynamic Metal Industries, Inc. (Dynamic), was an independent sales representative for Larsen Manufacturing, LLC (Larsen). Dynamic earned commissions based on manufacturing parts sold on Larsen's behalf to third parties. After Larsen terminated the agreement, Dynamic sued Larsen for breach of contract and a violation of the Illinois Sales

Representative Act (820 ILCS 120/0.01 *et seq.* (West 2020)), claiming that Larsen had failed to pay commissions that Dynamic earned under the agreement. On Larsen's motion, the circuit court granted summary judgment in its favor on both counts. Dynamic now appeals the judgment of the circuit court, contending that the court misinterpreted the parties' agreement and there was a genuine issue of material fact as to whether Larsen had breached the agreement. For the reasons that follow, we affirm the circuit court's grant of summary judgment in favor of Larsen.

¶ 3                                    I. BACKGROUND

¶ 4                          A. The Relationship Between Larsen and Dynamic

¶ 5      Larsen manufactures custom-metal parts to companies across multiple industries, including in the automotive space. Those companies, in turn, incorporate Larsen-manufactured parts into products they sell to other companies. In order to find third-party customers, Larsen utilizes independent sales representatives throughout the United States and world, and pays them commissions based on the sale of Larsen's products. Dynamic is such an independent sales representative and works with metal component manufacturers primarily in the Midwest. Dynamic had an existing relationship with Omron Automotive Electronics, Inc. (Omron), a St. Charles, Illinois-based electronic components manufacturer for automobile makers such as Ford and BMW.

¶ 6      In January 2011, Larsen contracted with Dynamic to be one of its independent sales representatives on a non-exclusive basis covering the territory of Northern Illinois and Wisconsin. Larsen agreed to pay Dynamic a 5% commission on products sold to companies it facilitated. However, Larsen retained the right to split commissions between multiple independent sales representatives. According to Paragraph 7, titled "Domestic Split Commissions," of the agreement:

"Split commissions occur when the design is achieved in one Sales Representatives

territory (Design Area), the Procurement function is performed in another

Representatives territory (Procurement Area) and the actual manufacturing is performed in another Representatives territory (Fulfillment Area) or any combination therein. In such cases, the commission split will compensate the Design Area Representative at 50%, the Procurement Area Representative at 25% and the Fulfillment Area Representative at 25% of the total commission payout."

The agreement defined "Design Area," "Procurement Area," and "Fulfillment Area" as well as provided examples of design, procurement and fulfillment activities. According to Paragraph 6 of the agreement, the "Design Area" was the "area/territory where the design effort occurs." The "Procurement Area" was "the area/territory where the purchasing organization placing the purchase order resides." Finally, the "Fulfillment Area" was the "area/territory where the production material is shipped."

¶ 7    According to a deposition from Jim Miles, Larsen's strategic accounts manager, the split-commissions provision was included in Larsen's sales representative agreements in response to the evolution of the manufacturing sales channel, wherein the design, procurement and fulfillment began to occur in different locations. Miles explained that the split-commissions provision guaranteed that the sales representative who brought Larsen the initial business would continue to receive credit in the form of commissions for the design work. However, Miles asserted that the provision allowed Larsen to ensure that procurement and fulfillment work were not neglected in the event the sales representative who brought Larsen the business "wasn't able to or willing to or interested in fulfilling the requirements of the procurement area or the fulfillment area because it fell outside his geographic territory."

¶ 8    The term of the agreement between Larsen and Dynamic was one year, but it would automatically renew for an additional year unless either party timely terminated it. According to

Paragraph 9b of the agreement, in the event of a termination, Dynamic would continue to be paid commissions for established part numbers for up to 10 years and new part numbers for up to 10 years, the latter so long as Dynamic received purchase orders for those parts within one year of the effective date of termination. As part of the agreement, Larsen designated Dynamic as the sales representative associated with Omron. Sometime in the mid-2010s, Omron opened up a manufacturing facility in Mexico to complement the facility already operational in St. Charles, Illinois.

¶ 9    In December 2018, Larsen provided Dynamic a notice of termination of the agreement to become effective the following month. According to a declaration submitted by David Larsen, the president of Larsen, in connection with the instant case, part of the reason Larsen terminated the agreement was because Dynamic, who was based in Illinois, was not adequately providing procurement and fulfillment work for Omron as "[Omron's] Mexico facility place[d] the vast majority [of] Larsen's orders from [Omron]." Following the notice of termination, Dynamic provided Larsen with a list of 46 established parts numbers, which were almost all for Omron, and 35 new part numbers, the majority of which were for Omron (hereinafter occasionally referred to as the "eligible parts"), that Dynamic believed it was entitled to post-termination commissions on based upon the parties' agreement.[1] According to David Larsen's declaration, the company agreed to pay Dynamic post-termination commissions on these parts, though it informed Dynamic of its intent to hire a sales representative to handle procurement and fulfillment activities for Omron in Mexico. Because Larsen did not have an independent sales representative designated to the Omron account when Larsen terminated the agreement with Dynamic, design, procurement and

_____

[1] Although the parties agree that Dynamic provided Larsen with a list of 46 established parts numbers, our count of the list shows it was actually 45 established part numbers.

fulfillment work between Larsen and Omron were handled completely internally, according to the deposition of Miles, Larsen's strategic accounts manager.

¶ 10    In late 2019, Nidec Mobility America Corporation (Nidec) acquired Omron (hereinafter, Omron/Nidec). By November 2020, Larsen still handled design, procurement and fulfillment work with Omron internally, as it had not yet retained a new independent sales representative designated to Omron/Nidec. However, that month, Larsen entered into a sales representative agreement with Wilson Sanchez doing business as V&N Technology Sales (V&N), a Mexico-based manufacturing sales representative. V&N's statement of work with Larsen, which adopted and incorporated by reference the terms and conditions of a sales representative agreement between the two parties, stated that V&N's responsibilities in Mexico included performing procurement and fulfillment work for Omron/Nidec. According to the declaration submitted by David Larsen in connection with the litigation, Larsen retained V&N so it could have a sales representative available in Mexico, who could visit, communicate and work with Omron/Nidec's employees there.

¶ 11    As a result of Larsen's agreement with V&N, Larsen informed Dynamic that V&N would handle procurement and fulfillment activities concerning Omron/Nidec. Citing the split-commissions provision in the parties' agreement, Larsen asserted that Dynamic's commission would be reduced by 50% effective immediately. According to a declaration submitted by Wilson Sanchez, V&N's sales manager, in connection with the litigation, V&N became the primary contact between Larsen and Omron/Nidec in Mexico. In the declaration, Sanchez detailed the procurement and fulfillment activities he had undertaken with regard to Omron/Nidec.

¶ 12                    B. The Litigation Between Larsen and Dynamic

¶ 13    In December 2020, Dynamic filed a three-count complaint for a declaratory judgment against Larsen, seeking a declaration that the parties' sales representative agreement did not allow

Larsen to split commissions following the termination of the agreement and that it was owed a 5% commission on all eligible parts. Dynamic later amended its complaint and added counts for breach of contract and a violation of the Sales Representative Act (820 ILCS 120/0.01 *et seq.* (West 2020)). During the proceedings, Dynamic voluntarily dismissed its declaratory judgment counts.

¶ 14     Larsen filed a motion to dismiss Dynamic's amended complaint pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2020)), contending that Dynamic failed to state a claim for breach of contract or a statutory violation because Larsen had the contractual right to reduce Dynamic's commission after it retained V&N to perform procurement and fulfillment work for Omron/Nidec. In resolving Larsen's motion, the circuit court determined that, as a matter of law, the agreement allowed Larsen to retain V&N and split commissions between Dynamic and V&N following the termination of Larsen and Dynamic's agreement. The court, however, found there was a question of fact as to whether V&N was "actually performing Procurement and Fulfillment work regarding the parts at issue." Consequently, the court denied Larsen's motion to dismiss.

¶ 15     Dynamic subsequently filed the operative second amended complaint. It alleged that the split-commissions provision of the agreement did not apply following the termination of the agreement. Dynamic therefore asserted that it was the only sales representative entitled to receive commissions on sales of eligible parts from Larsen to Omron/Nidec. As a result, in Count I, Dynamic alleged a breach of contract and claimed that Larsen owed it $23,854.62 in commissions—an amount, though, that would continue to increase as Larsen sold more eligible parts to Omron/Nidec. In Count II, Dynamic alleged a violation of the Sales Representative Act (820 ILCS 120/0.01 *et seq.* (West 2020)), asserting that Larsen had failed to pay its sales commissions following the termination of the agreement within the time period mandated by the

law. Dynamic posited that, pursuant to the statute, it was entitled to exemplary damages in the amount of three times the commissions owed as well as attorney fees and costs.

¶ 16    Thereafter, Larsen filed a motion for summary judgment, contending that the plain language of the agreement allowed it to split commissions between V&N and Dynamic. Additionally, Larsen asserted that the agreement allowed for split commissions when procurement and fulfillment functions were performed in a different sales representative's territory from the territory that the design was achieved in, irrespective of the quality of the procurement or fulfillment performance. As such, Larsen argued that, because it retained V&N as its new sales representative in Mexico to perform procurement and fulfillment functions, it was entitled to split the commissions on eligible parts between V&N and Dynamic, the latter who had been the sales representative where the design effort occurred for the eligible parts. To this end, Larsen claimed there were no genuine issues of material fact as to whether it breached the agreement, and it was entitled to summary judgment on Count I. Larsen further posited that, because there were no genuine issues of material fact as to whether it breached the agreement, there were no genuine issues of material fact as to whether it violated the Sales Representative Act (*id.*), which was parasitic to a breach of contract claim. Therefore, Larsen asserted it was entitled to summary judgment on Count II. In response, Dynamic contended that the split-commissions provision of the agreement did not apply following the termination of the agreement, and even if it did, V&N did not perform procurement or fulfillment services to Omron/Nidec to trigger a split of the commissions.

¶ 17    Following briefing and oral argument on Larsen's motion, the circuit court determined that, as a matter of law, the agreement allowed Larsen to split commissions between Dynamic and V&N following the termination of the agreement. Additionally, the court concluded that, as a matter of

law, the agreement allowed Larsen to split commissions between Dynamic and V&N for procurement and fulfillment work performed for Omron/Nidec in Mexico. Lastly, the court found there was no genuine issue of material fact as to whether V&N performed procurement and fulfillment activities to entitle it to a split of the commissions. As a result, the court determined that the undisputed record evidence established that Larsen did not breach the agreement. Consequently, the court granted Larsen summary judgment on Count I and on Count II because it was wholly reliant on Count I.

¶ 18    Dynamic timely appealed. In its notice of appeal, Dynamic sought review of the circuit court's denial of Larsen's motion to dismiss and grant of Larsen's motion for summary judgment.

¶ 19                                    II. ANALYSIS

¶ 20                              A. Motion to Dismiss

¶ 21    Initially, the parties dispute whether we can review the circuit court's denial of Larsen's motion to dismiss, as they disagree about whether the court's denial constituted a step in the procedural progression leading to summary judgment. See *CitiMortgage, Inc. v. Bukowski*, 2015 IL App (1st) 140780, ¶ 13. Despite this dispute, Dynamic wants us to review the court's finding when denying Larsen's motion to dismiss that the agreement allowed Larsen to split commissions post-termination. Larsen agrees that this finding is reviewable, albeit through the court's grant of summary judgment in its favor when the court reiterated that, "as a matter of law, the [agreement] permit[ted] post-termination commission-splitting." In other words, any alleged error in the denial of Larsen's motion to dismiss merged into the summary judgment, the final judgment in the case. See *Ovnik v. Podolskey*, 2017 IL App (1st) 162987, ¶ 19 (declining to review the denial of a section 2-619 motion to dismiss where "any error in the denial of the motion merge[d] into the final judgment, which in this case was the summary judgment *** and it is from that final judgment

that an appeal is taken"). That is to say, regardless of whether the court's denial of Larsen's motion to dismiss constituted a step in the procedural progression leading to summary judgment or the alleged error in the court's denial merged into the summary judgment (see *id.*), the parties agree that we can review the court's grant of summary judgment to Larsen, through which it found, as a matter of law, that the agreement allowed Larsen to split commissions post-termination.

¶ 22                                    B. Summary Judgment

¶ 23    We now turn to Dynamic's contention that the circuit court erred in granting Larsen's motion for summary judgment. Dynamic argues that the court misinterpreted the parties' agreement, erred by determining there was no genuine issue of material fact as to whether Larsen properly split commissions between it and V&N, and therefore, erred in finding there was no genuine issue of material fact as to whether Larsen breached the agreement.

¶ 24    Summary judgment is proper where the pleadings, depositions, affidavits, and admissions on file demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 25. "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. When determining whether a genuine issue of material fact exists, we construe "the evidence in the light most favorable to the nonmoving party and strictly against the moving party." *Johnson v. Armstrong*, 2022 IL 127942, ¶ 31. The disposition of litigation on "[s]ummary judgment is a drastic measure," and such a motion "should only be granted if the movant's right to judgment is clear and free from doubt." *Seymour v. Collins*, 2015 IL 118432, ¶ 42. We review the circuit court's grant of summary judgment *de novo. Id.*

¶ 25          1. Does the Agreement Allow Post-Termination Split Commissions?

¶ 26    Dynamic first posits that the circuit court erred in finding that its agreement with Larsen allows for split commissions following the termination of the agreement. Dynamic argues that the plain language of the agreement shows that the parties did not intend for the split-commissions provision to apply after the termination of the agreement. Rather, according to Dynamic, the split-commissions provision was intended only to apply when it was a sales representative for Larsen. Conversely, Larsen asserts that the plain language of the agreement allows for split commissions following termination, which is demonstrated by viewing the agreement as a whole.

¶ 27    Resolution of this issue turns on the interpretation and construction of the parties' contract, which is a question of law that we also review *de novo. In re Marriage of Dynako*, 2021 IL 126835, ¶ 15. Because this issue is a question of law, it is properly resolved through summary judgment. *Wolff v. Bethany North Suburban Group*, 2021 IL App (1st) 191858, ¶ 36. Our primary objective when construing a contract is to give effect to the intent of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). The best indication of that intent is the plain and ordinary language of the agreement. *Id.* at 233. Because a contract's language is dependent on context, the parties' intent cannot be gleaned from examining "any clause or provision standing by itself." *Id.* Rather, we must view the agreement as a whole and examine "each part in light of the others." *Id.*

¶ 28    As noted, the agreement between Dynamic and Larsen provided that Dynamic would be entitled to a 5% commission on "[a]ll accounts presented" by it "for services performed and products sold by [it]" to third-party customers. However, Paragraph 7 of the agreement provided that Larsen could split commissions between multiple independent sales representatives. According to that provision:

"Split commissions occur when the design is achieved in one Sales Representatives territory (Design Area), the Procurement function is performed in another Representatives territory (Procurement Area) and the actual manufacturing is performed in another Representatives territory (Fulfillment Area) or any combination therein. In such cases, the commission split will compensate the Design Area Representative at 50%, the Procurement Area Representative at 25% and the Fulfillment Area Representative at 25% of the total commission payout."

Finally, under Paragraph 9b, upon termination of the parties' agreement, Dynamic would:

"be paid commissions for established part numbers brought to [Larsen] by [Dynamic] for the life of the program or up to 10 years from the date of agreement termination, whichever comes first *** [and] be entitled to the commissions earned on new part numbers which were being worked on during the time prior to termination [for the life of the program or up to 10 years from the date of agreement termination, whichever comes first]."

¶ 29    Viewing the agreement as a whole, it permitted Larsen to split Dynamic's commissions on eligible parts following termination. Once Larsen terminated the agreement with Dynamic, the plain language dictated that Dynamic continue to be paid commissions, though at no explicit rate, for up to 10 years on eligible parts, those being parts already in existence and parts in development. The agreement could have provided for post-termination commissions at a specific percentage, but it did not. This omission is telling. See *Klemp v. Hergott Group, Inc.*, 267 Ill. App. 3d 574, 581 (1994) ("There is a strong presumption against provisions that easily could have been included in the contract but were not" and "[a] court will not add another term about which an agreement is silent."). And it is because Paragraph 9b must be read in conjunction with the rest of the agreement,

in particular Paragraph 5a, which sets forth the maximum commission percentage Dynamic could be entitled to of 5% for "services performed and products sold," Paragraph 6, which provides the definitions of "Design Area," "Procurement Area," "Fulfillment Area," and Paragraph 7, which allows for split commissions. See *Gallagher*, 226 Ill. 2d at 233.

¶ 30    Based on the definitions of "Design Area," "Procurement Area," "Fulfillment Area," as well as the examples of design, procurement and fulfillment activities in Paragraph 6, once parts have been designed by Larsen for Omron/Nidec, the design area for that specific part became immutable. And thus, Dynamic became entitled to 2.5% commissions for up to 10 years following the termination of the agreement on eligible parts that had already been designed. However, once Larsen terminated the agreement with Dynamic and Dynamic no longer was a sales representative for Larsen, Dynamic necessarily could no longer perform procurement or fulfillment activities, which, based on the examples in Paragraph 6, required a sales representative to be communicating with Omron/Nidec on Larsen's behalf about orders, shipping and quality assurance. This meant that the rate of Dynamic's post-termination commissions on eligible parts became dependent on the area where Omron/Nidec placed the purchase orders, the area where the parts were shipped for actual manufacturing and whether Larsen had a sales representative assigned to the procurement and fulfillment territory. And thus, for eligible parts after termination, Dynamic's commission could be anywhere from 2.5% to 5%, depending on the above circumstances.

¶ 31    Applying the split-commissions provision following termination is the only way to harmonize the entire agreement between Larsen and Dynamic and give effect to each provision therein. See *Clanton v. Oakbrook Healthcare Center, Ltd.*, 2023 IL 129067, ¶ 34 (observing that the goal in interpreting a contract is to "harmonize[] and give[] effect to all provisions of the contract and *** not render any language superfluous"). Moreover, such a reading produces the

most logical result. See *Foxfield Realty, Inc. v. Kubala*, 287 Ill. App. 3d 519, 524 (1997) (stating that courts "will construe a contract reasonably to avoid absurd results"). Under this interpretation of the agreement, Dynamic retains a 2.5% commission, a finder's fee for all practical purposes, for up to 10 years following the agreement's termination—a commission that rewards its past efforts but that requires no future efforts. That is Dynamic's reward for establishing the relationship and leading the design efforts on Larsen's behalf for Omron/Nidec. But the establishment of the relationship does not entitle Dynamic to the other 2.5% for doing nothing when the procurement and fulfillment functions for Larsen's customers occur in another sales representative's territory, all of which require efforts by the sales representative. It would be illogical for a sales representative to agree to perform procurement and fulfillment activities for free, which is why the sales representative is entitled to a portion of the commissions if the procurement and fulfillment activities occur in its territory. See *id.* As such, the parties intended for the split-commissions provision to apply following the termination of the agreement.

¶ 32    Nevertheless, Dynamic highlights that the split-commissions provision of the agreement uses present tense while the post-termination provision of the agreement uses future tense. See *Empress Casino Joliet Corp. v. W.E. O'Neil Construction Co.*, 2016 IL App (1st) 151166, ¶ 94 (using the tense of verbs in interpreting a contract). Dynamic therefore posits that the split-commissions provision created a temporal boundary to apply only when the agreement was in effect compared to the post-termination provision. We do not impart the same significance to the tenses of the words in the respective provisions because to do so would result in the agreement's disharmony, as such a construction would ignore the potential ongoing procurement and fulfillment work necessary for eligible parts. See *Clanton*, 2023 IL 129067, ¶ 34.

¶ 33    Dynamic further highlights that Paragraph 7—the split-commissions provision—is titled "Domestic Split Commissions." Citing to Black's Law Dictionary, Dynamic asserts the word "domestic" is defined as "[o]f, relating to, or involving one's own country." Black's Law Dictionary (11th ed. 2019). And thus, according to Dynamic, Paragraph 7 could only apply when the design area effort, the procurement area effort and the fulfillment area effort occurred "domestically" in relationship to the territory at issue. To this end, because Larsen retained V&N to provide procurement and fulfillment functions in Mexico, and not the United States, *i.e.*, domestically to where the design area effort, the split-commissions provision did not apply to the sales of eligible parts. Regardless of the title of the split-commissions provision containing the word "Domestic," there is no indication from the actual, binding contractual provisions that the split-commissions provision was meant to apply only when the design area, the procurement area and the fulfillment area efforts occurred "domestically" in relationship to the territory at issue. Therefore, the plain language of the parties' agreement allowed Larsen to split Dynamic's commissions following the termination of the agreement. Consequently, the circuit court properly interpreted the relationship between the split-commissions provision and the post-termination provision of the agreement.

¶ 34                    2. Did Larsen Properly Exercise the Split-Commissions Provision?

¶ 35    Dynamic next argues that, even if Larsen had the contractual authority to split commissions following the termination of the agreement, the circuit court erred when it determined that Larsen properly exercised the split-commissions provision of the agreement to divide commissions between it and V&N. Dynamic posits that the court misinterpreted the split-commissions provision by not determining that, for the provision to be properly invoked, it and V&N had to be assigned

to different sales territories contemporaneously. As to this argument, we again must interpret the parties' agreement, where our prior discussion of contract interpretation principles applies.

¶ 36    Paragraph 7 of the agreement is unambiguous that a split-commissions scenario occurs when the design is achieved in one sales representative's territory, the procurement is performed in another sales representative's territory and the fulfillment function is performed in another sales representative's territory, or any combination therein. As the definitions in Paragraph 6 illustrate, the procurement area means where the purchase orders originated and the fulfillment area means where the parts are shipped for actual manufacturing. Based on these definitions, once Larsen terminated Dynamic and hired V&N to be its sales representative in Mexico beginning in November 2020, any time a purchase order for eligible parts originated in Mexico and any time eligible parts were shipped to Mexico for actual manufacturing, V&N became entitled to 2.5% commissions on those eligible parts.

¶ 37    Critically, the split-commissions scenario only began in November 2020 despite Dynamic's agreement with Larsen having terminated in January 2019. That is because, during this nearly two-year period, Larsen did not have a sales representative in Mexico and handled the Omron/Nidec account internally, meaning Larsen could not exercise the split-commissions provision and Dynamic maintained its full 5% commission. But once V&N became Larsen's sales representative in Mexico, from where Omron/Nidec purchased eligible parts and where eligible parts were shipped for actual manufacturing, Larsen had the authority to exercise the split-commissions provision of the agreement. Although Dynamic argues that, in order for the split-commissions provision to be properly invoked, it and V&N had to be assigned to different sales territories contemporaneously, such a reading of the agreement is contrary to its plain language. Nothing in the parties' agreement requires the sales representatives to contemporaneously assigned

to different sales territories, and we cannot imply such language. See *Klemp*, 267 Ill. App. 3d at 581. As such, the circuit court properly interpreted when the split-commissions provision applies.

¶ 38     Nevertheless, Dynamic highlights various evidence in the record and argues that there was a genuine issue of material fact as to whether V&N performed procurement and fulfillment activities related to the eligible parts. Given this, Dynamic argues there was a genuine issue of material fact as to whether Larsen breached the parties' agreement, which should have precluded summary judgment. In order to prove a breach of contract, the plaintiff must prove that: (1) there was an enforceable contract, (2) it substantially performed its obligations, (3) the defendant breached its obligations and (4) it suffered damages due to the defendant's breach. *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2022 IL 127903, ¶ 28. If there is a genuine issue of material fact as to whether the defendant breached an agreement with the plaintiff, summary judgment is improper. See *Finch v. Illinois Community College Board*, 315 Ill. App. 3d 831, 837 (2000).

¶ 39     Dynamic's argument presupposes that the agreement between it and Larsen requires a certain quantity or quality of procurement and fulfillment activities performed by V&N for V&N to be entitled to split commissions. But the plain language of the agreement does not require a certain level of procurement and fulfillment activities. Rather, the agreement only requires procurement (*i.e.*, where the purchase orders originated) and fulfillment (*i.e.*, where the parts are shipped for actual manufacturing) to be performed in another sales representative's territory. In other words, it is irrelevant the quantity or quality of procurement and fulfillment activities performed by V&N because the plain language of the agreement does not require a sales representative to do any specific procurement and fulfillment work to obtain split commissions.

¶ 40    Given the split-commissions provision's unambiguous language and the fact that the record evidence plainly demonstrates that, since November 2020, V&N has been Larsen's sales representative in Mexico assigned to the Omron/Nidec account, Larsen was allowed to split the commissions between V&N and Dynamic for any eligible parts ordered in Mexico by Omron/Nidec or shipped to Mexico for actual manufacturing by Omron/Nidec. Therefore, there is no genuine issue of material fact as to whether Larsen breached its agreement with Dynamic and Larsen has not breached that agreement as a matter of law. Although the circuit court did not grant Larsen summary judgment based on this reason—but rather found no genuine issue of material fact that V&N was performing procurement and fulfillment activities on eligible parts—we may affirm the court's grant of summary judgment on any basis supported by the record. See *Miller v. Lawrence*, 2016 IL App (1st) 142051, ¶ 22. But we note that Larsen raised this argument both below to the circuit court and on appeal. Consequently, the circuit court properly granted summary judgment to Larsen on Count I of Dynamic's second amended complaint.

¶ 41    We next turn to Count II of Dynamic's second amended complaint, in which it claimed that Larsen violated the Sales Representative Act (820 ILCS 120/0.01 *et seq.* (West 2020)). The statute provides that "[a]ll commissions due at the time of termination of a contract between a sales representative and principal shall be paid within 13 days of termination, and commissions that become due after termination shall be paid within 13 days of the date on which such commissions become due." *Id.* § 120/2. The statute further states that "[a]ny provision in any contract between a sales representative and principal purporting to waive any of the provisions of this Act shall be void." *Id.* The statute defines the term "sales representative" and "principal" (see *id.* § 120/1(3), (4)), but neither party disputes that Dynamic constituted a sales representative and Larsen constituted a principal for purposes of the statute. Under the statute, if a principal fails to timely

pay commissions to a sales representative following the termination of the parties' agreement, the principal "shall be liable in a civil action for exemplary damages in an amount which does not exceed 3 times the amount of the commissions owed to the sales representative" as well as be required to pay the sales representative's reasonable attorney fees and court costs. *Id.* § 120/3. Claims under the Sales Representative Act are "parasitic" to breach of contract claims. *AA Sales & Associates, Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 609 (7th Cir. 2008).

¶ 42    In the instant case, we have found that the circuit court properly concluded there was no genuine issue of material fact as to whether Larsen breached the agreement with Dynamic and that Larsen did not breach the agreement as a matter of law. Because claims under the Sales Representative Act are "parasitic" to breach of contract claims (*id.*), it follows that there was no genuine issue of material fact as to whether Larsen violated the Sales Representative Act and that Larsen did not violate the act as a matter of law. Consequently, the circuit court properly granted summary judgment to Larsen on Count II of Dynamic's second amended complaint.

¶ 43                                III. CONCLUSION

¶ 44    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 45    Affirmed.