2024 IL App (1st) 230254-U

No. 1-23-0254

Third Division
June 20, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| KEVIN CALLINAN, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | Appeal from the Circuit Court |
| v. | ) | of Cook County. |
| | ) | |
| SHEVICK SALES CORPORATION, an Illinois | ) | No. 2019 L 002064 |
| Corporation, d/b/a Sleep on Latex and Earthfoam, and | ) | |
| KARL SHEVICK, an Individual, | ) | The Honorable |
| | ) | James E. Snyder, |
| Defendants | ) | Judge Presiding. |
| | ) | |
| (Shevick Sales Corporation, an Illinois Corporation | ) | |
| d/b/a Sleep on Latex and Earthfoam, | ) | |
| Defendant-Appellant). | ) | |
| | ) | |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices D.B. Walker and Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The trial court's judgment is affirmed, where (1) the parties entered into a valid principal and sales representative relationship, which entitled the plaintiff to commissions even after the relationship ended, and (2) the trial court did not abuse its discretion in awarding plaintiff attorney fees and court costs.

¶ 2    The instant appeal arises from unpaid sales commissions allegedly owed to plaintiff Kevin Callinan due to work he performed for defendant Shevick Sales Corporation (SSC). Plaintiff contended that, pursuant to an agreement by the parties, he was entitled to commissions for certain sales made after he ceased selling SSC's products, while SSC maintained that the plaintiff was not entitled to such commissions. After a bench trial, the trial court found in favor of plaintiff and entered an award for the unpaid commissions, as well as for attorney fees and costs. On appeal, SSC claims that the trial court erred both in finding that plaintiff was owed any commissions and in awarding attorney fees. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4    In 2019, plaintiff filed suit against SSC and its owner, Karl Shevick (collectively, defendants), alleging that defendants failed to pay him commissions he was owed for his work as a salesman for SSC. Plaintiff's complaint alleged a total of five counts: count I was for breach of contract against SSC, count II was for violation of the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq.* (West 2018)) against both defendants, count III was for violation of the Sales Representative Act (Sales Act) (820 ILCS 120/0.01 *et seq.* (West 2018)) against SSC, count IV was for unjust enrichment against SSC, and count V requested an accounting by SSC.

¶ 5    Counts II and V were dismissed on defendants' motion, and the parties engaged in mandatory arbitration on the remaining three counts, resulting in an arbitration award in favor of plaintiff in the amount of $72,483.06, plus reasonable attorney fees and costs. SSC, however, rejected the award, and the matter ultimately proceeded to trial on counts I and III.[1]

---

[1] Plaintiff voluntarily dismissed count IV immediately prior to trial.

¶ 6      The evidence at trial set forth the following. Plaintiff was a longtime latex foam salesman in the mattress industry, and had been working with Latexco, a supplier of latex foam rubber based in Belgium, for 15 years. When working with Latexco, plaintiff had been paid through commissions, and made approximately $300,000 in 2016, his last full year with the company. At the end of 2016, Latexco hired a new CEO, and plaintiff was informed that "things could be changing" with respect to his income.

¶ 7      Plaintiff was acquainted with Shevick, the owner of SSC, and had previously sold him latex products; SSC was in the business of selling latex mattress toppers, primarily online. In the summer of 2017, plaintiff and Shevick discussed the possibility of SSC selling a certain latex product, which was eventually branded as Earthfoam. Shevick and plaintiff met several times in the fall of 2017, eventually agreeing that plaintiff would leave Latexco to sell Earthfoam. Both parties were aware that plaintiff was nearing retirement, and wished to work for another two to three years prior to retiring. In September 2017, plaintiff and Shevick exchanged several e-mails concerning the matter. As the parties' e-mails serve as an important component of the trial court's rulings, we relate them in considerable detail.

¶ 8      The first e-mail, dated September 20, 2017, was from plaintiff, and referenced previous discussions concerning Earthfoam:

> "Confirming our Earth Foam discussions:
>
> First year:
>
> $15,000 /month via monthly invoices submitted by Q1Source, consultant.[2]

_____

[2] In his appellate brief, plaintiff indicates that Q1Source is a "business in name only" which plaintiff used in order to receive his commission payments.

3

+2.5% commission on all topper/core sales & related other products yet to be determined.

7% on latex noodles & shred

$3,500 /month business related expenses (travel, phone, meals, office, etc.)

Year 2 and beyond should be discussed further to create a clear understanding of our agreement:

5% on all sales until retired.

After retirement, TBD, 2%? Duration?

I will provide you with a list of all that I can do for you for the monthly fee and commission. It goes beyond sales[.]

If you can tie-up a nice volume of Organic GOLS certified latex, we have a winner with Earth Foam."

¶ 9      In response, Shevick sent an e-mail the next day, providing, in relevant part:

"To address the expenses issue in the first year, I would like to bump your commission to 5% rather than add $3500/month. This should add some extra money to cover expenses. I think this will also [be] better around the 1 year mark as there will be no issue with determining exactly when the orders are coming in.

Here is what we are looking at:

First year:

$15,000 /month via monthly invoices submitted by Q1Source, consultant.

+5% commission on all topper/core sales & related other products yet to be determined.

7% on latex noodles & shred

Year 2 and Retirement:

$3,500 /month business related expenses (travel, phone, meals, office, etc.)

5% commission on all topper/core sales & related other products yet to be determined.

7% on latex noodles & shred (Just be aware that the availability and price situation can change on this in the future)

After retirement, TBD, 2%? Duration (on customers brought in during your time working)? We can discuss this further."

Plaintiff responded the same day, asking for "the weekend to digest the info." Plaintiff ultimately decided to accept the offer, and began working at SSC at the beginning of October 2017.

¶ 10    Plaintiff worked for SSC between October 2017 and March 2018, at which point plaintiff and Shevick participated in an industry trade show in which SSC had a booth highlighting Earthfoam. On the Monday morning after the trade show, plaintiff attempted to access his e-mail, but was unable to do so. Plaintiff contacted Shevick, who informed him that his services were no longer needed. Plaintiff and Shevick had a number of conversations after this time, which culminated in two e-mails in April 2018.

¶ 11    First, on April 2, 2018, plaintiff e-mailed Shevick, with a subject line titled "Separation Agreement":

"Thank you for arranging the April consulting payment.

Please confirm that this will continue through (including) September 2018.

For the 5% sales commission to be paid ongoing starting with March 2018 sales through what period of time? Is the 2% retirement commission part of your thought process beyond the 5% payments?

It is my understanding that you will provide me a list of current & potential customers that will be included in these 5% commission payments including existing customers, customers that I spoke with at [the trade show] or invited into our space.

I am just trying to get a handle on my future income that we both agree to now and avoid misunderstandings later.

No lawyers need to be involved. Our gentlemen's agreement is fine."

¶ 12          Shevick responded on April 4, 2018:

"Yes, this will continue until September.

The 5% commission will continue until September of 2019. The 2% commission would kick in after that.

Anything qualifying for the 2% commission has to be related to something that you were working on or that you had set up.

We will send you a list of the leads from [the trade show] and mark who we would include in the 5% commission. The 5% commission would apply to existing customers or customers that you brought into our space in some fashion (for example, you had invited them to the booth or had some kind of pre-existing relationship with). If someone who you didn't know randomly walked into the booth and you talked to them for a few minutes, I would not include that. Once we send you the list, you can let me know if you have any issues with it.

Clearly, there is an element of my discretion in all of this, but I do intend to be fair and am happy to discuss any issues that you have."

¶ 13  SSC paid plaintiff $15,000 in May, as well as commission payments through June. At the beginning of June, Shevick ceased responding to plaintiff's invoices and payment requests, and on June 11, 2018, sent plaintiff a letter via e-mail which provided that SSC would no longer be making any payments, as it had determined that plaintiff had not complied with "Conditions" of the separation agreement, claiming that plaintiff had "interfered with Company customers, shared proprietary and confidential information of the Company's suppliers with third parties, utilized proprietary and confidential information of the Company to harm the Company's business, and assisted third parties in designing products intended to interfere with the Company's business." Shevick also requested immediate repayment of all payments which had previously been made by SSC under the separation agreement. There was no further communication from Shevick, but SSC made several commission payments between November 2018 and March 2019.[3]

¶ 14  At the end of the trial, the trial court found in favor of plaintiff with respect to both counts. The trial court found that there was a contract between plaintiff and SSC which was subsequently modified after the trade show. The court further found that the terms of the modified contract provided that (1) plaintiff would be paid $15,000 per month until September 2018; (2) plaintiff would receive 5% commission on sales generated by the clients he brought to SSC until September 2019; and (3) plaintiff would continue to receive 2% commission on sales generated by clients he brought to SSC after that point. The trial court further found that

_____

[3] The record on appeal suggests that these commission payments were made after plaintiff had retained counsel in the instant matter.

the contract was governed by the Sales Act, as "this is a structure for resolution of the sales commission payment," and plaintiff was therefore entitled to recover his attorney fees. The trial court requested further briefing from the parties as to the appropriate amount of the judgment, in light of its findings, and ultimately entered judgment in the amount of $78,032.88, consisting of (1) $60,000 in unpaid monthly consulting fees and $10,875 in interest on such fees, (2) $3372.94 in unpaid commissions and $412 in interest on such commissions, and (3) $3372.94 in exemplary damages.

¶ 15    Plaintiff filed a fee petition, requesting $243,617.50 in attorney fees and $8109.48 in costs. In response, SSC contended that the fee amount was excessive, where plaintiff was entitled to attorney fees only for his Sales Act claim (count III) and where plaintiff and counsel had a contingency-fee arrangement which provided for a maximum of $39,107.48 in attorney fees, based on the amount of the judgment. SSC further claimed that plaintiff was not entitled to any attorney fees for the parties' earlier arbitration. After a hearing, the trial court ultimately awarded plaintiff $242,625 in attorney fees and $6830.23 in costs.

¶ 16    SSC timely filed a notice of appeal, and this appeal follows.

¶ 17                                ANALYSIS

¶ 18    On appeal, SSC claims that the trial court erred both in finding that plaintiff was owed any commissions and in awarding attorney fees. We consider each argument in turn.

¶ 19                       *Validity and Terms of Contract*

¶ 20    We first consider SSC's claim that neither the September 2017 nor the April 2018 e-mails were sufficient to form a contract, meaning that SSC was not obligated to pay plaintiff commissions after he ceased making sales. "[T]he issues of whether a contract existed, the parties' intent in forming it, and its terms are all questions of fact to be determined by the trier

8

of fact." *Prignano v. Prignano*, 405 Ill. App. 3d 801, 810 (2010) (citing *Hedlund & Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 205 (2007)); *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 81. In a bench trial, as in the instant case, it is the function of the trial judge to weigh the evidence and make such findings of fact. *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433 (1991). On review, we will not disturb the trial court's findings of fact unless they are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Id.* at 252. Importantly, "[t]he court on review must not substitute its judgment for that of the trier of fact." *Kalata*, 144 Ill. 2d at 434; *Eychaner*, 202 Ill. 2d at 252.

¶ 21       The "basic ingredients" of a contract are an offer, acceptance, and consideration. *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 151 (2006). A contract need not be contained in a single writing and may consist of several different writings which, when combined, establish the parties, subject matter, terms, and consideration. *O'Brien v. Kawazoye*, 27 Ill. App. 3d 810, 816 (1975). Where applicable, "the parties' correspondence may constitute a contract, even if it is necessary to refer to several documents to establish its terms." *Harris v. American General Finance Corp.*, 54 Ill. App. 3d 835, 838-39 (1977); see also *In re Marriage of Christos*, 2023 IL App (1st) 211187-U, ¶ 66 (noting that some courts, both in Illinois and in other jurisdictions, have recognized that an exchange of e-mails may constitute an enforceable agreement); *Williams v. LincolnWay Community Bank*, 2022 IL App (1st) 220131-U, ¶ 21 (noting that establishment of a contract would require reference to the parties' e-mails as well as documents referenced in the e-mails).

¶ 22    In this case, the purported contract between plaintiff and SSC was set forth in e-mails between plaintiff and Shevick in September 2017 and April 2018. SSC raises arguments concerning both sets of e-mails, claiming that plaintiff was not entitled to commission payments pursuant to either.

¶ 23    September 2017 E-mails

¶ 24    SSC first contends that the September 2017 e-mails did not constitute a contract, as the terms were not sufficiently definite. As an initial matter, we note that SSC did not make this claim during the trial; while it argued that there was no meeting of the minds as to the length of plaintiff's employment and his retirement compensation, it never disputed that the parties had some sort of contractual relationship between the time of the September 2017 e-mails and the trade show in March 2018. Indeed, during his closing argument, SSC's counsel noted that "there's no question that in September of 2017 when he [came] on board up until March of 2018 that there was a principal and sales representative relationship." Accordingly, SSC has forfeited this argument on appeal. [4] See *Vantage Hospitality Group, Inc. v. Q Ill Development, LLC*, 2016 IL App (4th) 160271, ¶ 49 ("It has long been the law of the State of Illinois that a party who fails to make an argument in the trial court forfeits the opportunity to do so on appeal.").

¶ 25    Moreover, even notwithstanding any forfeiture, we do not find SSC's argument persuasive. For a contract to be enforceable, its terms must be sufficiently definite such that its terms are reasonably certain and able to be determined. *Halloran v. Dickerson*, 287 Ill. App. 3d 857, 868

---

[4] We note that, while SSC disputed that the September 2017 e-mails gave rise to a contract in its motion to dismiss the complaint in May 2019, the motion to dismiss on this basis was denied and SSC did not raise the issue during trial. Similarly, the argument in SSC's brief concerning the statute of frauds was raised only in the motion to dismiss and was not raised at trial, so we likewise find it forfeited on appeal.

(1997). "[A] contract is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." (Internal quotation marks omitted.) *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 314 (1987). A contract may be enforced even though some terms may be missing or left to be agreed upon, but "if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 30 (1991).

¶ 26     In this case, the September 2017 e-mails set forth sufficient detail to enable the trial court to ascertain the scope of the parties' agreement. While there were some terms left to be agreed upon, the basic structure and terms of the agreement were clear, namely, that plaintiff was entitled to a monthly sum plus commission payments for the first year, followed by a largely commission-based payment structure until his retirement, at which point he would be eligible for residual commissions for a period of time. We therefore find that the September 2017 e-mails constituted a contract governing the parties' relationship.

¶ 27     We, however, agree with SSC that the September 2017 e-mails did not set forth a fixed term for the contract, but constituted a contract which was terminable at will.[5] An employment relationship without a fixed duration is terminable at will by either party. *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 489 (1987); see also *Jespersen v. Minnesota Mining & Manufacturing Co.*, 183 Ill. 2d 290, 293 (1998) (noting that contracts of indefinite duration are terminable at the will of either party). Our supreme court has explained that the

---

[5] We note that SSC suggests that the trial court's findings regarding this issue are contradictory, as the trial court found that SSC had the right to terminate the contract but also found that plaintiff's right to commissions survived the termination. As we explain further below, these findings are not contradictory and, in fact, are entirely consistent with the law and the language of the contract.

rationale for such a rule is twofold. First, as a general matter, absent fraud, duress, or undue influence, parties should be free to "order their affairs" without court interference. *Jespersen*, 183 Ill. 2d at 295. In addition, perpetual contracts are disfavored, since " '[f]orever' is a long time and few commercial concerns remain viable for even a decade." *Id.* If, however, the parties have contracted otherwise, the presumption that the contract sets forth an at-will relationship may be overcome. *Duldulao*, 115 Ill. 2d at 489.

¶ 28    Here, although there were references to multiple time periods—"First year," "Year 2 and Retirement," and "After retirement"—the September 2017 e-mails did not expressly set forth a duration for the contract. There can be no dispute that the parties clearly intended a multiyear relationship extending until plaintiff's eventual retirement; both the language of the e-mails and the parties' testimony indicate that plaintiff and Shevick planned for plaintiff to sell Earthfoam for two to three years until he retired. The fact that the parties contemplated a multiyear relationship, however, did not necessarily *obligate* them to continue such a relationship under the terms of the contract. In other words, the mere fact that the contract provided for adjustments to the payment structure in future years does not automatically mean that either party was prevented from terminating their sales relationship prior to plaintiff's retirement. This is especially apparent under the circumstances of the instant case, as the parties' testimony established that the purpose of the monthly payments plaintiff received during the first year was to account for the likelihood that he would require time to build a customer base sufficient to provide adequate commission payments. We cannot find that this accommodation served to bind the parties into a non-terminable relationship lasting until the time of plaintiff's retirement. Indeed, it is not unusual for a contract to include provisions anticipating the continued existence of the contractual relationship into the future—if a

contract does not have a built-in termination date, the expectation is that the contractual relationship continues until one of the parties, or a specified event, terminates it. Even in such cases, however, our courts have found the contracts terminable at will absent language demonstrating otherwise. See, *e.g.*, *Jespersen*, 183 Ill. 2d at 296 (parties' sales distribution agreement lasted "thirteen or more years" prior to termination of contract). Here, there is no language indicating that the parties' agreement contained a fixed duration and, accordingly, it was terminable at will by either party.[6]

¶ 29        Despite SSC's contention to the contrary, however, the fact that the contract was terminable at will does not necessarily preclude plaintiff from being entitled to receive commission payments even after the termination of the contract. It is well-settled that, in certain circumstances, a party may be entitled to commissions on sales made after the termination of a contract. See, *e.g.*, *Rico Industries, Inc. v. TLC Group, Inc.*, 2018 IL App (1st) 172279, ¶ 58 (discussing the "procuring cause" doctrine, which operates as a default rule for payment of commissions when a salesperson's contract is terminated); *Dynamic Metal Industries, Inc. v. Larsen Manufacturing, LLC*, 2023 IL App (1st) 230894-U, ¶¶ 29-31 (discussing rate of post-termination commissions under sales representative contract). Indeed, the September 2017 e-

---

[6] While not discussed by either party, we also observe that "plaintiff's retirement" is an event entirely within plaintiff's control, which could conceivably occur at any time. Plaintiff does not address the possibility that his retirement could have occurred during the "First year" or "Year 2 and Retirement" time periods governed by the contract—*i.e.*, if *plaintiff* chose to end the relationship prior to the "two or three" years intended by the parties at the time they entered into their relationship—or the possibility that plaintiff could have chosen to postpone his retirement beyond that timeline. Plaintiff also does not address *his* obligations under the contract—*i.e.*, if he was unhappy with the amount of commissions he was receiving, it is unclear whether plaintiff believes that *he* would have had the right to terminate the sales relationship prior to the "two or three years" he was intending to sell for SSC. The fact that the duration of the agreement is entirely within plaintiff's control—*i.e.*, he could retire at any time—lends further support for the finding that the contract is terminable at will. See, *e.g.*, *R.J.N. Corp. v. Connelly Food Products, Inc.*, 175 Ill. App. 3d 655, 660 (1988) (finding a contract which provided that the agreement would remain in effect " 'for as long as Connelly serves Rich's customers' " (emphasis omitted) was terminable at will, as the termination event was entirely within the defendant's control).

mails indicate that the parties were well aware of this possibility, as the e-mails establish that the parties contemplated the payment of some commissions after plaintiff's retirement, although the details of those payments remained unresolved. The September 2017 agreement, however, did not expressly discuss the situation present in the instant case—the termination of the sales relationship prior to plaintiff's retirement. Accordingly, we turn to consideration of the parties' April 2018 e-mails, which the trial court found operated as a modification of the September 2017 agreement and governed the parties' post-termination obligations.

¶ 30                                              April 2018 E-mails

¶ 31        As noted, the trial court found that the September 2017 agreement was silent as to the parties' obligations in the event that plaintiff ceased selling Earthfoam products prior to his retirement and, accordingly, the parties entered into a "Separation Agreement" in April 2018 to govern their relationship. The trial court characterized the April 2018 e-mails setting forth this agreement as a "modification" of the September 2017 agreement, a finding which SSC challenges on appeal.

¶ 32        Parties to an existing contract may modify the contract by mutual assent, provided that the modification does not violate law or public policy. *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 468 (2004). Such modification normally occurs when the parties agree to alter a contractual obligation or impose additional obligations, "while leaving intact the overall nature and obligations of the original agreement." *Id.* The modified contract is regarded as creating a "new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed." *Id.* at 469. A valid modification must satisfy all the criteria necessary for the formation of a contract, namely, offer, acceptance, and consideration. *Id.* at 468.

¶ 33    In this case, SSC claims that the April 2018 e-mails were gratuitous and lacked consideration and, therefore, did not constitute a valid modification. Consideration consists of "the bargained-for exchange of promises or performances, and may consist of a promise, an act or a forbearance." (Internal quotation marks omitted.) *Carter v. SSC Odin Operating Co.*, 2012 IL 113204, ¶ 23. Furthermore, " '[a]ny act or promise which is of benefit to one party or disadvantage to the other is sufficient consideration to support a contract.' " *Id.* (quoting *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 330 (1977)). Whether a contract contains consideration is a question of law, which we review *de novo*. *Dohrmann v. Swaney*, 2014 IL App (1st) 131524, ¶ 23.

¶ 34    The trial court in the instant case specifically found that the April 2018 modification "is supported by consideration" on each side, and later explained that this consideration included plaintiff's claims as to his entitlement to commissions under the September 2017 agreement. On appeal, plaintiff contends that "[t]he forbearance of his rights under the original agreement and acceptance of an altered commission structure in exchange for being relieved of on-going duties is sufficient consideration for the modification." Although our analysis is slightly different, we generally agree with plaintiff's position.

¶ 35    As we have discussed above, the September 2017 agreement was terminable at will, so we do not find persuasive plaintiff's contention that his agreement to cease selling Earthfoam constituted consideration for the modification. We nevertheless agree with plaintiff that the evidence established the existence of consideration for the April 2018 modification. The September 2017 agreement provided plaintiff with a payment structure consisting of (1) a monthly sum plus "5% commission on all topper/core sales & other related products yet to be determined" and "7% on latex noodles & shred" for the first year, followed by (2)

15

reimbursement for business expenses plus "5% commission on all topper/core sales & other related products yet to be determined" and "7% on latex noodles & shred" from the second year until his retirement, at which point (3) he would be eligible for residual commission payments for some period of time. As noted, a party may be entitled to commissions on sales made after the termination of a contract under certain circumstances. Accordingly, even after SSC terminated its sales relationship with plaintiff, SSC could still potentially owe plaintiff commission payments as set forth in the September 2017 agreement.

¶ 36    Instead of pursuing such payments, plaintiff sent Shevick an e-mail in April 2018 in an attempt to "get a handle on my future income that we both agree to now and avoid misunderstandings later." Plaintiff further suggested that "[n]o lawyers need to be involved. Our gentleman's agreement is fine." The parties ultimately agreed that plaintiff would be entitled to (1) monthly payments through September 2018, (2) 5% commission payments on sales to "existing customers or customers that you brought into our space in some fashion" until September 2019, then (3) 2% commission payments on sales "related to something that you were working on or that you had set up." These provisions provided plaintiff with less than he had been entitled to under the September 2017 agreement, as his previous commission payments were based on "*all* topper/core sales & related products" (emphasis added), while the modified payments would be based only on "existing customers or customers that you brought into our space in some fashion." We find that plaintiff's acceptance of lower commission payments, plus his comments indicating that he wished to resolve the matter without the use of attorneys,[7] provided consideration for the April 2018 modification. See

---

[7] We reject SSC's claim that plaintiff's use of the term "gentlemen's agreement" meant that the agreement was legally unenforceable, as the context of plaintiff's e-mail and plaintiff's testimony at trial demonstrate that plaintiff was simply attempting to resolve the matter without the use of attorneys, not making a representation as to the legal effect of the agreement.

*Kalis v. Colgate-Palmolive Co.*, 337 Ill. App. 3d 898, 901 (2003) (a promise to forego pursuit of a legal claim is sufficient consideration, even if the claim is ultimately determined to be invalid); *F.H. Prince & Co. v. Towers Financial Corp.*, 275 Ill. App. 3d 792, 799 (1995) (the compromise of a disputed claim will serve as consideration, as will a promise to forego legal action).

¶ 37     SSC also argues that the April 2018 modification was not valid where there was no meeting of the minds as to its terms. Specifically, SSC points to Shevick's statement that "there is an element of my discretion in all of this" and claims that the parties had different opinions as to its meaning. We do not find this argument persuasive. Despite Shevick's testimony at trial, the only reasonable interpretation of this language is that Shevick would have discretion as to which customers for which plaintiff would be entitled to receive the 5% commission. Indeed, the bulk of the e-mail concerned the determination of such customers. We find no basis for SSC's contention that the entire *agreement* was even arguably subject to Shevick's "discretion" and therefore find that the April 2018 agreement constituted a valid modification of the September 2017 agreement.

¶ 38                                        *Sales Act*

¶ 39     We next consider SSC's claim that the trial court erred in finding that SSC had violated the Sales Act by failing to pay plaintiff commissions. The Sales Act provides, in relevant part:

> "All commissions due at the time of termination of a contract between a sales representative and principal shall be paid within 13 days of termination, and commissions that become due after termination shall be paid within 13 days of the date on which such commissions become due." 820 ILCS 120/2 (West 2016).

17

¶ 40       On appeal, SSC claims that the Sales Act was not applicable, as the trial court expressly found that the parties' agreement was never terminated. SSC's argument, however, misinterprets the trial court's findings below. We therefore discuss the trial court's findings in some detail before discussing the applicability of the Sales Act to the instant case.

¶ 41                                   Trial Court Findings

¶ 42       In its ruling at the conclusion of the trial, the trial court found that there was a contract between the parties and that, after the trade show, Shevick "determined to terminate that contract and terminate his association with the plaintiff." The trial court found that there was nothing in their agreement which prevented Shevick from doing so, but that "in the event that the contract terminated, there were obligations on commissions and things like that that would survive the termination." The parties subsequently communicated with each other and "conducted a substantial modification of their agreement," which the trial court found was likely due to the fact that the September 2017 agreement "did not provide for any way for them to resolve their affairs." These communications resulted in the April 2018 agreement, which the trial court found was a valid modification of the existing agreement. After discussing the terms of the agreement, the trial court concluded by finding that "this is a structure for resolution of the sales commission payment, and therefore it is covered by the [Sales Act]."

¶ 43       After SSC filed a posttrial motion focused on the applicability of the Sales Act,[8] the trial court made further findings regarding the issue in its denial of the motion. In summarizing its previous finding, the trial court noted:

_____

[8] We note that SSC's motion did not claim that the trial court had found that the parties' agreement was "never terminated," as it now argues on appeal. Instead, its motion was based on the claim that the April 2018 agreement did not give rise to a principal and sales representative relationship and therefore was not governed by the Sales Act.

18

"These parties, as you know from the original ruling, ventured into an agreement with one another. *** As the course of events went on, they modified that agreement. No doubt I found and still believe based on the evidence and the Plaintiff's burden of proof that there was not a termination of the September 2017 agreement and a new contract entered into in April 2018. There was a modification of that agreement."

¶ 44 The trial court continued:

"[The modified agreement] regarded the payment of due and owing commission sales and that structure and the [Sales Act] as applicable. And *** to the extent to which there's been any confusion, I appreciate the opportunity to indicate that the findings based on the evidence was [sic] not *** that there was a new agreement, not that the agreement was terminated and they entered into a new one but that there was a modification of that agreement in April [2018], offer, acceptance supported by consideration and the Sales Representative Act applied."

¶ 45 Considering the trial court's findings in their entirety, we cannot agree with SSC's position that the trial court found that the parties' contract was never terminated such that the Sales Act is inapplicable. The trial court expressly found that, after the trade show, Shevick "determined to terminate [the parties'] contract and terminate his association with the plaintiff," and that such an action was permitted under the parties' agreement. The rest of the trial court's findings concerned *how* that termination was effectuated—*i.e.*, which obligations survived the termination. While its language arguably could have been more precise, the trial court's discussion of the impact of the April 2018 agreement on the existing September 2017 agreement served to emphasize its finding that the April 2018 agreement represented a modification, *not* a new contract, and it is in that light that those comments should be

interpreted. We thus cannot find that its comments may be fairly interpreted as a finding that there was no termination of the parties' employment relationship whatsoever, as SSC contends.[9]

¶ 46                                    Applicability of Sales Act

¶ 47        As noted, as applicable to the instant appeal, the Sales Act requires any "principal" who contracts with a "sales representative" to pay the sales representative all posttermination commissions due and owing within 13 days of the date on which they become due. 820 ILCS 120/2 (West 2016). SSC contends, however, that the Sales Act did not apply to the posttermination commissions owed in this case, as the April 2018 modification extinguished the principal and sales representative relationship between the parties and the required payments were therefore not "commissions" under the Sales Act. We do not find this argument persuasive.

¶ 48        On appeal, SSC does not dispute that a principal and sales representative relationship existed under the September 2017 agreement.[10] As explained above, the September 2017 agreement was modified by the April 2018 agreement, which governed the parties' posttermination obligations. A modified contract is regarded as creating a "new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed." *Schwinder*, 348 Ill. App. 3d at 469.

---

[9] We note that there may be arguments as to *when* that relationship terminated—whether at the time that Shevick ordered plaintiff to stop selling Earthfoam (March 2018), or at the time that the parties reached a resolution as to SSC's remaining obligations (April 2018). The resolution of that issue, however, is not necessary to our analysis as the important question in this case is *whether* the relationship was terminated, not *when*.

[10] While SSC argues in its appellate brief that the September 2017 agreement did not constitute a valid contract, as discussed above, this argument was made in the alternative to its Sales Act argument.

The modification, however, "leaves the general purpose and effect [of the original contract] undisturbed." *Id.* at 468.

¶ 49    In this case, we cannot agree that the April 2018 agreement extinguished the parties' previous relationship, as it merely set forth the parties' agreement as to their obligations in a factual scenario not addressed in the original September 2017 agreement. The "general purpose and effect" (*id.*) of the original agreement—*i.e.*, the principal and sales representative relationship—remained intact even in light of the modification. Consequently, SSC remained obligated as "principal" to pay plaintiff, as "sales representative," all commissions which became due after the termination of the contract. See 820 ILCS 120/2 (West 2016).

¶ 50    We also find unpersuasive SSC's contention that the payments owed were not "commissions," as they were not compensation for making a sale. A " '[c]ommission' " under the Sales Act is defined as "any compensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the dollar amount of orders or sales or as a percentage of the dollar amount of profits." *Id.* § 120/1(1). The Sales Act does not require that the sales representative be the individual making the sale directly, only that it be "*any* compensation" accruing to the sales representative which is expressed as a percentage of orders, sales, or profits. (Emphasis added.) *Id.* Here, the parties agreed that plaintiff would be compensated for sales made to customers he brought into the company, expressed as a percentage of such sales. This form of compensation falls squarely within the definition of a "commission" under the Sales Act. We therefore can find no error in the trial court's finding that the Sales Act applied to the parties' agreement.

¶ 51                                             *Attorney Fees*

21

¶ 52    The final matter raised by SSC on appeal is its contention that the trial court erred in its award of attorney fees. Plaintiff was entitled to an award of reasonable attorney fees pursuant to section 3 of the Sales Act. See 820 ILCS 120/3 (West 2016) (where a principal fails to timely pay commissions, "such principal shall pay the sales representative's reasonable attorney's fees and court costs"). In this case, the trial court awarded plaintiff a total of $242,625 in attorney fees and $6830.23 in court costs. SSC claims that this award was excessive and included attorney fees to which plaintiff was not entitled.

¶ 53    An award of attorney fees is generally left to the discretion of the trial court, and we will not overturn a fee award absent an abuse of that discretion. *In re Estate of K.E.J.*, 382 Ill. App. 3d 401, 424 (2008). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Haage v. Zavala*, 2021 IL 125918, ¶ 40. In computing reasonable attorney fees pursuant to a fee-shifting provision in a statute, our supreme court has found that "use of the phrase 'reasonable attorney fees' indicates an intent to allow recovery based on the prevailing market rate for the attorney's services." *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 51. In determining a reasonable fee award, a court considers (1) the skill and standing of the attorney employed, (2) the nature of the case, (3) the novelty and difficulty of the questions, (4) the amount and importance of the subject matter, (5) the degree of responsibility in the management of the case, (6) the time and labor required, (7) the usual and customary charges in the community, and (8) the benefits resulting to the client. *Collins v. Hurst*, 316 Ill. App. 3d 171, 173 (2000); see also *In re Estate of Callahan*, 144 Ill. 2d 32, 44 (1991). The court should also consider the nature of the attorney fee

agreement between the successful litigant and his or her attorney. *Collins*, 316 Ill. App. 3d at 173.

¶ 54    In this case, SSC contends that the "reasonable" fee for plaintiff's attorney's services is found in the contingency fee agreement entered into between plaintiff and its counsel, namely, one-third of the gross value of any recovery obtained. "Where a contingency fee represents the standard remuneration for the type of case involved, an award in the amount of the contingency fee may be appropriate." *Grauer v. Clare Oaks*, 2019 IL App (1st) 180835, ¶ 131. The court, however, should not rely on the agreement as the sole basis in determining a reasonable attorney fee but instead should consider it as one factor in its determination. *Id.*; see also *Collins*, 316 Ill. App. 3d at 173-74; *Blankenship v. Dialist International Corp.*, 209 Ill. App. 3d 920, 927 (1991); *Renken v. Northern Illinois Water Co.*, 191 Ill. App. 3d 744, 752 (1989).

¶ 55    Here, the trial court conducted a thorough analysis of plaintiff's fee petition, expressly considering each of the factors set forth above and ultimately determining its fee award. We find the trial court's approach proper and its fee award amply supported by the evidence, and reject SSC's claims that the trial court's award was excessive or included payment for improper entries. We further note that SSC's characterization of plaintiff's fee agreement with his counsel is incomplete. While SSC claims that plaintiff agreed to pay his counsel "one third of the gross value of any recovery obtained" if he prevailed, the actual language of the fee agreement is not so limited. Instead, the agreement provided:

> "In addition to the accord payment [of $7500 owed by plaintiff], Client agrees to assign to Attorney the higher of: (1) one third of the gross value of any recovery obtained, whether by settlement, mediation, trial, arbitration, or otherwise; (2) Attorney fees awarded by a court or arbitrator; or (3) separately negotiated Attorney's fees."

Thus, even under the language of the fee agreement, plaintiff's counsel was not limited to "one third of the gross value of any recovery obtained" but instead could recover attorney fees awarded by a court. We therefore find no merit to SSC's suggestion that the fee agreement demonstrated that plaintiff's fees were excessive.

¶ 56     As a final matter, SSC contends that the trial court erred in awarding fees incurred as part of arbitration. First, we see no reason why the fees incurred during the arbitration should not be considered part of the "reasonable attorney's fees" plaintiff was expressly authorized to recover under the Sales Act. See 820 ILCS 120/3 (West 2016). Moreover, SSC acknowledges that, under the circuit court rules, if a party rejecting an arbitration award "fails to obtain a better result at trial," the party rejecting the award "shall pay the other party's reasonable legal fees incurred in connection with the arbitration." Cook County Cir. Ct. R. 25.11 (eff. Dec. 1, 2014). Here, the amount awarded to plaintiff during the arbitration was $72,483.06, plus reasonable attorney fees and court costs. The judgment amount in favor of plaintiff after trial was $78,032.88, plus reasonable attorney fees and court costs. While SSC makes arguments as to whether the outcome was "better" after trial, as the arbitration award did not contain statutory interest and the amounts awarded were slightly different, the simple fact remains that plaintiff was awarded a larger judgment after trial than after the arbitration. We see no way in which this cannot be considered a "better result" for plaintiff. As a result, we find no error in the trial court including the arbitration as part of its fee calculation.

¶ 57                                          CONCLUSION

¶ 58     For the reasons set forth above, we affirm the trial court's judgment in its entirety. First, the parties' September 2017 agreement was a valid contract, which was properly modified in

April 2018. Second, the parties' relationship was subject to the provisions of the Sales Act.

Finally, the trial court did not abuse its discretion in its attorney fee award.

¶ 59        Affirmed.